IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SUPPORT HOSE STORE TEXAS MANAGEMENT, LLC, | § § § § |
| PLAINTIFF, | § § |
| v. | § CIVIL ACTION NO. _____ § JURY TRIAL DEMANDED |
| FIELD OF DREAMS, INC; VANDA LANCOUR; RODNEY LANCOUR, and AARON LANCOUR, | § § § § § |
| DEFENDANTS. | § |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff Support Hose Store Texas Management, LLC, ("Plaintiff") files this Original Complaint against Defendants, Field of Dreams, Inc., Vanda Lancour, Rodney Lancour, Brent Lancour and Aaron Lancour (collectively "Defendants").

## PARTIES

1. Plaintiff Support Hose Store Texas Management, LLC is a Limited Liability Company organized under the laws of the State of Texas with its principal place of business located at 3937 Hollow Lake Road, Roanoke, Texas 76262.

2. Defendant Field of Dreams, Inc., is represented and is alleged to be a Corporation in compliance and organized under the law of the State of Texas with its principal place of business located in, Amarillo, Texas 79119 and registered agent Vanda Lancour located at 2300 Bell St. Ste 2, Amarillo, Texas 79106. Defendant Rodney Lancour is an individual with an interest in Field of Dreams and an officer of the same residing in the State of Texas. Defendant Vanda

PLAINTIFF'S ORIGINAL COMPLAINT PAGE    1

Lancour is an individual with an interest in Field of Dreams, Inc. and an officer of the same, residing in the State of Texas. Aaron Lancour is an individual with an interest in Field of Dreams and an officer of the same residing in the State of Texas.

## JURISDICTION AND VENUE

3.      This action arises under the Trademark Laws of the United States, 15 U.S.C. §§ 1051, et seq. Subsequently, this court has Federal Question Jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331,1338(a), and 1338(b), and 15 U.S.C. § 1121 for the claims arising under the Lanham Act. This Court has original jurisdiction over the state law claims in this action under 28 U.S.C. § 1367(a) and the principles of supplemental jurisdiction.

4.      The Court has personal jurisdiction of all Defendants. Each Defendant is a resident of the State of Texas and each defendant does business in this state. Venue is proper under 28 U.S.C. §§ 1391(b) and (c).

## FACTS

5.      Early in the spring of 2014, Michael O'Leary, now President of Plaintiff Support Hose Store Texas Management, LLC, was contacted by Derek Gaskins, an acquaintance of both Mr. O'Leary and the Defendants about the potential sale and/or purchase of the majority of assets, either held by, or in the name of Field of Dreams Inc., including SupportHoseStore.com. See AFF of Mr. O'Leary ¶ 4 attached hereto as Exhibit A. It was indicated by the Lancours to Mr. O'Leary that the Defendants were actively seeking a buyer as soon as possible do to financial concerns and impending foreclosure issues. AFF of Mr. O'Leary ¶ 6. It appeared to Mr. O'Leary that the Defendants needed a buyer very soon or the business was going to close its doors.

6.     The corporation, Field of Dreams Inc., was the majority owner, if not the sole owner, of the assets in discussion of potential purchase, and the Lancours are the owners of Field of Dreams, Inc.  However, Plaintiff does not concede that Field of Dreams, Inc. is a viable corporation for this action and holds the right to challenge its status as a Corporation.

7.     The parties entered into an Asset Purchase Agreement on September 24, 2014 after a few months of discussion with regard to the same. See Asset Purchase Agreement dated September24, 2014 attached hereto as Exhibit B.  Along with the Asset Purchase Agreement, the parties also entered into a 5-year Non-Compete agreement dated the same, September 24, 2014 as part of the overall transaction. See Non-Compete and Confidentiality Agreement dated September 24, 2014 attached hereto as Exhibit C.  Along with the Asset Purchase Agreement and the Non-Compete Agreement, the Lancours desired an employment agreement with Defendant Vanda Lancour as part of the purchase price for the assets.  See AFF Michael O'Leary ¶ 8, see also Employment Agreement dated September 24, 2014 attached hereto as Exhibit D.

8.     The Employment Agreement was designed for the Lancours, specifically Vanda Lancour, to receive $1,500 per month along with "2% net sales (defined as Gross Sales less Returns and Allowances, less applicable sales tax, less shipping revenues) bonus for the duration of this agreement."  See Employment Agreement.  Again, this Employment Agreement was intended to be part of the purchase price for the assets in question.

9.      On November 11, 2014, approximately forty-eight (48) days after the September 24, 2014 Asset Purchase Agreement, the 5-year Non-Compete Agreement, and the Employment Agreement were all signed, Defendant Rodney Lancour and Vanda Lancour filed for Chapter 7

Bankruptcy in the Northern District of Texas case # 14-20368-rlj7.   The Defendants' Bankruptcy filing does not indicate the 2% commissions paid to Defendant Vanda Lancour in October of $2,007.56 and in November in the amount of $3,240.04.   Defendant Vanda Lancour continued to receive commissions in December 2014 thru December 2015 totaling $41,707.64.

10.     The assets discussed, and eventually traded according to the Asset Purchase Agreement signed and dated September 24, 2014, reads as follows:

"Exhibit A"

**Description of the Assets**

The following properties and assets of the Seller:

Domains are as follows:

1. www.supporthosestore.com
2. www.supporthosestore.net
3. www.supporthosestore.org
4. www.supporthosestore.info
5. www.askVanda.com
6. Ask Vanda blog and related blogs and content
7. Any other website(s) or domain(s) identified by either party in connection with this Agreement or purchase agreement, or that have been established in connection with Support Hose Store

Trade Names or Trade Marks associated with the Following:

1. Support Hose Store
2. SupportHoseStore.com

Customer Data Base:

1. All data regarding any customer data collected in any fashion or media that is associated with Support Hose Store or Supporthosestore.com

Social Media:

1. Facebook account and password(s)
2. Twitter account and password(s)
3. Any other social media account(s) or password(s)

Inventory of goods:

  1. All inventory that has been shipped to buyer and evidenced in a signed document agreed to by both parties.

  Office equipment:
  1. HP 4700 color printer.

11. The Purchase Price of the assets described above include the sum of two outstanding secured debts/bank loans personally guaranteed by Defendants Vanda and Rodney Lancour, and paid in full by Plaintiff, in the amount of $284.340.14 and $54,200.74 respectively, along with a payment in the amount of $35,000 for remaining inventory, and the Employment Agreement for Vanda Lancour as described above in paragraph 8.  See Asset Purchase Agreement § 1.4; see also Employment Agreement.

12. In addition to the list of assets described in the Asset Purchase Agreement, several emails and other correspondence, including phone conversations, took place between the parties prior to, and in conjunction with the overall asset purchase. See AFF Mike O'Leary ¶ 16.  These prior communications will help explain the meaning of the assets in the Asset Purchase Agreement. The most notable asset that requires explanation is the discussion regarding the active customer data base and what an active customer represents.  Supposedly, there were 92,938 customers with an email within the customer data base according to Defendants.  See email transcript dated February 12, 2014 attached hereto as Exhibit E; see also AFF Michael O'Leary ¶ 15.   The customer number was part of the Asset Purchase Agreement, and was a significant part of the overall purchase price and valuation of the assets. See AFF Michael O'Leary ¶¶ 18-19.  Mr. O'Leary tried several times to elaborate on the amount of active customers were in the data base and Defendants would not provide a straight answer, even though their ability to obtain the correct number was available.  See Email Transcript dated February 12, 2014 ¶¶ 17-18 and

Email Transcript dated April 2, 2014 attached hereto as Exhibit F.  Mr. O'Leary asked for the data base to perform his own analysis, but was denied access until after the asset sale because Defendants viewed Mr. O'Leary as a competitor and access to the data base would impair the Defendant's business, at the time of negotiation.   In reality, only 42,946 active customers were in the customer data base according to the webmaster Mel Gerben that could be considered active over the past three years. See AFF of Mel Gerben ¶¶ 8-9 attached hereto as Exhibit G; see also AFF Michael O'Leary ¶ 17.  To find out the active customer count from the overall customer data base, Mr. Gerben attached a "filtering" to the customer data information to produce the number indicated above.  Again, for timing purposes, Defendants would not provide Plaintiff with the actual overall customer data base until after the purchase date, however, once the Plaintiff finally had access to all the customer data information, Mr. Gerben was able to perform the filtering process described above.   It is universally accepted that not every single person that has ever purchased a product from a company would be considered a customer, or an active customer in a customer data base.  For example, someone that has purchased a product from a company and then later asked to be removed from a mailing list would not be considered a customer or active customer.

13.     Most important to the topic regarding the customer data base was the amount of "active" customers within the overall data base.  A discussion with regard to the meaning of the word active and non-active customers took place between the Defendants and Mr. O'Leary on several occasions and can be inferred from the emails attached hereto as Exhibits E & F.  See AFF Michael O'Leary ¶¶ 16-19.  Mr. O'Leary eventually became confident that the Defendants did understand the three-year (3 year) cut-off for active customers and felt assured the calculations received (92,938 customers) did in fact represent this three-year (3 year) maximum. Industry

Case 4:16-cv-00653-O   Document 1   Filed 07/08/16   Page 7 of 18   PageID 7

standard definition of an active customer is likely a customer that has purchased in the previous 12 months, however, an acceptable definition of an active customer to Mr. O'Leary was a customer that made a purchase within the last three years. See Mr. O'Leary AFF ¶ 16.  It was a three-year previous purchase active customer definition that calculated 42,946 active customers by Mr. Gerben.  A three-year definition is generous and actually benefits the Defendants because it widens the net to calculate a larger number.  At all times the Defendants had access to the actual information during the negotiations or could obtain the information due in part to their ownership and activity in the company.

14.     Continuing with the company valuation process, Mr. O'Leary inquired about the amount of customers for the previous year (2013), meaning, the total number of customers who ordered in the year 2013, regardless of how many times one person ordered.  The Defendants answered the inquiry with 14,590 customers ordered in 2013, when actually there were 9,905 different customers that ordered in 2013. See AFF Mel Gerben ¶¶ 10-11.  At all times the Defendants had access to the actual information due in part to their ownership and activity in the company and could have provided the correct information.

15.     Likewise, as part of the company valuation the largest repeat customers were evaluated and discussed.  Of course, larger customers would be valued differently than smaller customers, in terms of amounts purchased in previous years.  Support Hose Plus was the largest customer of SupportHoseStore.com with average yearly sales of $136,039 per year in 2013 and 2014.  See AFF Michael O'Leary ¶ 22.    Support Hose Plus is a store that is owned by Defendants.  Clearly, this was a major factor with regard to valuation of the business assets of SupportHoseStore.com going forward and accounted for in the 5-year Non-Compete Agreement signed and dated the same day as the Asset Purchase Agreement, September 24, 2014.  In 2015,

PLAINTIFF'S ORIGINAL COMPLAINT PAGE         7

the first full year after the September 2014 asset sale, the total purchases made by Support Hose Plus was a total of $30,843.  This loss in sales was violation of the 5-year non-compete clause section (ii) on page 2, and if continued for the full 5-year non-compete term, the loss in sales will equal approximately $575,000 over the 5-year life of the non-compete.

16. Next, the Trademark  was registered by Defendants on November 15th 2005 and later assigned to Plaintiff on September 24, 2014 as part of the Asset Purchase Agreement, which was later recorded with the United States Trade Mark Office on November 7th, 2014.  The Trademark is still alive and in good standing.   The ® located on the top right-hand corner of this logo is prima fecia evidence of notice to Defendants under 15 U.S.C. §§ 1111, 1115(a) that this Trademark is registered and protected.  Likewise, Defendants had actual notice, not just prima fecia notice, that this Trademark was registered and in good standing because they were the original owner of the Trademark and sold the Trademark to Plaintiff.

17. After the asset purchase was completed in September 2014, Defendants continued using a logo almost exactly identical on their website for Support Hose Plus for over a year, which is entirely separate from SupportHoseStore.com.  The picture on the right was taken off their website prior to this case and after the Asset Purchase Agreement was signed.

    

This logo is in connection to goods or services and is likely to cause confusion or mistake, or deceive affiliation, among other things. The picture on the left is Plaintiff's Registered Trademark. Plaintiff believe they were damaged by such commercial use. Below is a full view of the Webpage displayed by Defendants in violation of 15 U.S.C. § 1125(a).



18.     In addition, as part of the Asset Purchase Agreement, the Defendants agreed to supply Plaintiff with the login and password information to all email, website, and vendor accounts of SupportHoseStore.com, including AskVanda accounts. See Asset Purchase Agreement and Exhibit A list of Assets. Despite the asset sale happening in September of 2014 and repeated requests from Plaintiff, passwords and login credentials to all operating sites were not provided until May of 2015.

19. In September of 2015, Defendant Vanda Lancour re-set and effectively "locking-out" Plaintiff from the core business email operating accounts after she changed the password. There was no reason for Defendants to be in the SupportHoseStore.com email operating system after they sold the rights to the email system to Plaintiff, especially one year later since the system was sold. Defendant Vanda Lancour was unable to access the email system on her first attempt in September of 2015 and therefore sent an email password change request from the system to her private email in order to change the password and gain access without authorization or informing Plaintiff of her actions.

## COUNT I

## LANHAM ACT - TRADEMARK INFRINGEMENT

20. Plaintiff repeats and realleges paragraphs 1 through 19 of the Complaint as if fully set forth herein.

21. Defendants were obligated upon the sale of assets, including the Registered Trade Mark I.D.# 78403321 to cease all use of the Support Hose Store Marks or Trademarks. In contravention of these obligations, and without Plaintiff's consent or authorization, Defendants have used, and might continue to use, all or some of the Trademarks as indicated above.

22. Defendants' acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Support Hose Store Trademarks, and Defendants' sale, offering for sale, distribution or advertising of goods and services under the Support Hose Store Trademark, or any marks similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l)(a), (b), and

(b)(Flush Language).  Under 15 U.S.C. § 1114(b)(Flush Language) damages and profits are available to the violated registrant only if the Defendants acted with knowledge and intent to confuse.  Because Defendants were the previous owner of the Trademark in question, its fairly simple to reach the conclusion that they had knowledge of the violation with the intent to confuse, cause mistake, or deceive potential customers.

23. Defendants are in the business, or were in the exact same business as Plaintiff, with access to use of the exact specific Trademark at issue, prior to the sale of the Trademark. Because the Defendants had actual knowledge, actual notice, and previous use of the exact Trademark being infringed upon because they previously owned the Trademark. The Defendants clearly intended to deceive the public, cause confusion, or mistake, and should be ordered to forfeit the profits or ordered to pay damages in the amount of $25,000, or other amount decided by the court, as allowed under 15 U.S.C. § 1114.

24. Likewise, unless enjoined by the Court, Defendants may continue to use and infringe the Support Hose Store Trademarks, to Plaintiff's irreparable injury. This threat of future injury to Plaintiff's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Support Hose Store Trademarks.

## COUNT II

## LANHAM ACT - UNFAIR COMPETITION

25. Plaintiff repeats and reallege paragraphs 1 through 24 of the Complaint as if fully set forth herein.

26. Defendants' acts, practices, and conduct alleged above constitute unfair competition, false designation of origin, and false or misleading descriptions or representations of fact, in that

they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

27.     As a direct and proximate result of Defendants' infringement and unfair competition, Plaintiff has been irreparably injured, including injury to its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

28.     Plaintiff seeks damages in the amount of $25,000, or any other amount the Court deems appropriate for such infringement.

29.     Likewise, unless enjoined by the Court, Defendants will continue to compete unfairly with Support Hose Store, to Plaintiff's irreparable injury. This threat of future injury to Plaintiff's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued unfair competition.

## COUNT III

## BREACH OF CONTRACT – ASSET PURCHASE AGREEMENT

30.     Plaintiff repeats and reallege paragraphs 1 through 29. of the Complaint as if fully set forth herein.

31.     Article I and IV of the Asset Purchase Agreement were breached by Defendants because Defendants represented that more than 92,000 active customers were in the customer data base when actually the amount of active customers in the customer data base was less than 43,000.

This figure was less than half the amount represented.  In addition, the amount of active customers in the customer data base was a significant factor in the valuation process for Plaintiff.

32.     Article I and IV of the Asset Purchase Agreement were breached by Defendants because Defendants failed to deliver in a timely manner the login and password credentials for all the following: Support Hose Store core web login, all other email accounts, vendor accounts, and AskVanda account, until May of 2015, some 8 months after the sale of the Asset Purchase Agreement. The delay in access for Plaintiff to the website caused unknown amount of revenue loss.

33.     Plaintiff seeks the value of the deal with no further payment of 2% employment commission, and with the repayment of 2% commissions that are already paid by Plaintiff to Defendant Vanda Lancour in the amount of $46,955.24, and any other amount the Court finds appropriate to cure breaches for customer count discrepancies and damage for loss of company control without login and password information.

## COUNT IV

## BREACH OF CONTRACT – NON-COMPETE AGREEMENT

34.     Plaintiff repeats and reallege paragraphs 1 through 34. of the Complaint as if fully set forth herein.

35.     Defendants breached the 5-year Non-Compete Agreement when Defendants stopped making purchases for Support Hose Plus through SupportHoseStore.com in 2015.  Support Hose Store Plus is owned by Defendants.   Defendants knew that Support Hose Plus was a major customer, and the largest active customers in the active customer data base of Support Hose Store in 2013 and 2014, when Defendants enticed Plaintiff with the potential continued

purchases of products by Support Hose Plus in the valuation process. One of the main purposes of the 5-year Non-Compete agreement was to keep the major customers of SupportHoseStore.com, which included Support Hose Plus.

36.     Plaintiff seeks the value of the asset purchase agreement with no further payment of 2% commissions paid under the Vanda Lancour employment agreement, and payment of loss in sales for the life of the 5-year non-compete agreement from Support Hose Plus, approximately $575,000, or another amount the court finds fair and reasonable.

## COUNT V

## COMMON LAW FRAUD

37.     Plaintiff repeats and reallege paragraphs 1 through 37. of the Complaint as if fully set forth herein.

38.     Defendants made a material misrepresentation when the Defendants represented that the customer data base contained 92,938 customers when there were only 42,946 actual active customers in the customer data base. Defendants were asked specifically what the customer order count was for the three (3) previous years and would not answer or determined that clarification was needed. See Email dated April 2, 2014. Conversations were held with Mr. O'Leary where it was absolutely apparent that only 3 years customers would be valued and not the entire database or some other portion of the customer data base. Even after these conversations, the Lancours continued to represent that 92,000+ active customers were in the data base. See AFF Mike O'Leary ¶16. According to Webmaster Mr. Gerben, the amount of active customers within the three-year (3) time frame was actually 42,926. See AFF Mel Gerben ¶ 9   Likewise, Plaintiff requested that Defendant show how many customers ordered in 2013,

and the Defendants answered the inquiry with 14,590 customers ordered in 2013, when actually there were 9,905 customers that ordered in 2013. See AFF Mel Gerben ¶¶ 10-11. These representations were a major, or material, factors in the decision to purchase the assets of SupportHoseStore.com assets.   The customer data base representations were in fact false. The Defendants made the representations and knew they were false when made, or made the representations recklessly because they had access to the data base the entire duration of the negotiations.  The Defendants made the representations with the intent that the Plaintiff act on their assertions because these were direct questions asked to the Defendants during the negotiations by the Plaintiff and the Defendants need to sell as soon as possible.  The Plaintiff acted upon the customer data base information because it was valued high enough to purchase the assets.  The Plaintiff has suffered from the representations made by the Defendants because the 42,946 customers made this asset less than half as valuable and/or the difference between figures regarding the amount of customers who made orders in 2013 was 4,685.

39.     Intent of the Defendants to make assets appear more valuable than they actually are can further be determined based on the fact that Defendants filed personal chapter 7 bankruptcy less than 2 months after the sale of the asset.  See Avete Patners, L.P. V. Gunnerman, 594 F.3d 390 (under Texas Common Law Fraud, a party's intent is determined at the time the party made the representation; however, a party's intent may be inferred by the party's subsequent acts following the representation).  The Defendants Rod Lancour and Vanda Lancour needed a buyer for the assets and needed the purchase price to include the payment of the debt they were both personally liable for with regard to $284,340.14 for the Amarillo National Bank note, and $54,200.74 FORA Financial Advance, LLC note.  Since the two notes were paid off, Defendants Rod Lancour and Vanda Lancour could file personal Chapter 7 Bankruptcy and the assets of the

company would not be affected by foreclosure, or any other creditor remedy. Likewise, Defendants intended to complete the sale and file chapter 7 as soon as possible once they were removed from the two notes mentioned above in order to protect their home through the Texas exemptions under chapter 7. Otherwise, the two Banks mentioned above might have access to such property as a secured debt.

40. Plaintiff seeks a direct award for the value of the deal with no further payment of 2% commission to Defendant Vanda Lancour, and payment of one year's worth of value lost on a gross margin basis in the amount of $339,945, and exemplary damages under Texas Civil Practice and Remedies Code § 41.003(a)(1) in the amount of $500,000. In Re Enron Corp, Securities Derivative & ERISA Litigation, 284 F.Supp. 2d 511 (S.D. Tex. 2003) (Tort damages, including exemplary damages, are available for common-law fraud claim under Texas Law). See In Re Carroll, 464 B.R. 293 (Bkrty. N.D. Tex.) (under Texas Law, fraudulent inducement claims, even those related to contract, sound in Tort and may support award of exemplary damages, even if damages sustained by Plaintiff were purely economic).

## COUNT VI

## NEGLIGENT MISREPRESENTATION

41. Plaintiff repeats and re-allege paragraphs 1 through 40. of the Complaint as if fully set forth herein.

42. Defendants made a representation in the course of their business, or in a transaction in which they had a pecuniary interest with the sale of assets to Plaintiff. The Defendants supplied false information for the guidance of others in their business when they provided the total amount of customers within the customer data base was more than double the actual amount. The

Defendants did not exercise reasonable care or competence in obtaining the or communicating the information because the information was significantly incorrect, yet Defendants had complete access to the correct information. Plaintiff decided to make the asset purchase based in part on the amount of customers represented by Defendants in the data base and suffered injury based on that decision.

43. Plaintiff seeks a direct award of the value of the deal with no further payment of 2% commission to Defendant Vanda Lancour, and one year's worth of value lost on a gross margin basis in the amount of $339,945.

## ATTORNEY'S FEES

44. Plaintiff is entitled to an award of attorney's fees under 15 USC § 1117(a), and the Texas Business Practice and Remedies Code.

## JURY DEMAND

45. Plaintiff requests a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

(1) A permanent injunction enjoining Defendants and their agents, servants, employees, affiliates, divisions, subsidiaries, agents, servants, and employees, and those in association with Defendants from using the Trademark owned by Plaintiff in commerce or otherwise, using the mark indicated in the above complaint in any type of commerce or otherwise, or any similar mark that can be confusing or deceiving to potential customers in any type of commerce or otherwise;

(2) An award of damages as requested on each Count indicated above;

(3) An award of exemplary damages as requested above;

(4) An award of costs of this action, including attorney's fees and interest; and

(5) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

Respectfully Submitted,

/S/Michael D. Higgins
Michael D. Higgins
Texas Bar #
24059947
1900 Industrial Park Blvd,
Suite 208
Colleyville, TX
Phone 972-210-1896
Fax: 888-235-8257
Email: Mikehiggins33@yahoo.com